# In the United States Court of Federal Claims

No. 06-801C
(Filed Under Seal: June 27, 2008)
(Reissued: July 7, 2008)[1]

* * * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| **IRIS CORPORATION BERHAD,** | * | Patent Infringement; 28 U.S.C. § |
| | * | 1428; Standing; Exclusive |
| Plaintiff, | * | Licensee; Joinder; Necessary Party |
| | * | Plaintiff; RCFC 19; Subject |
| v. | * | Matter Jurisdiction. |
| | * | |
| **THE UNITED STATES,** | * | |
| | * | |
| Defendant, | * | |
| and | * | |
| | * | |
| **FULCRUM IT SERVICES COMPANY and** | * | |
| **3M ROCHFORD THOMPSON, LTD.,** | * | |
| | * | |
| Third-Party Defendants. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

Stephen N. Weiss, Moses & Singer, LLP, 405 Lexington Avenue, New York, NY, for Plaintiff.

John A. Hudalla, U.S. Department of Justice, 1100 L Street, NW, Washington, DC, for Defendant.

---

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING DEFENDANT'S MOTION FOR JOINDER**

---

**WILLIAMS**, Judge

---

[1] This opinion was issued under seal June 27, 2008. The Court invited the parties to submit proposed redactions by July 3, 2008. On June 30, 2008, Plaintiff filed extensive proposed redactions. The Court ordered Plaintiff to show cause by July 10, 2008, why its proposed redactions were warranted. On July 7, 2008, Plaintiff's counsel filed a response to the show cause order stating that upon consultation with his client, Plaintiff agreed that no basis exists to request redaction of any part of the Court's June 27, 2008 Opinion and Order. No other redactions being received, the Court publishes this opinion in toto.

In this patent infringement suit, Plaintiff, IRIS Corporation Berhad (IRIS Malaysia), alleges that Defendant has infringed certain claims of U.S. Pat. No. 6,041,412 (the '412 patent) entitled "Apparatus and Method for Providing Access to Secure Data or Area," by using secure electronic passport readers and having these manufactured and installed in the United States.

This matter comes before the Court on Defendant's motion to dismiss for lack of standing or failure to join an indispensable party. The Government contends that IRIS Malaysia lacks standing because, although Plaintiff is the assignee of the patent-in-suit, Plaintiff exclusively licensed this patent in the United States to nonparty Winston Williams who held all substantial rights in the patent on the day this lawsuit was filed.

The Court denies this aspect of the motion, finding that under the governing license agreement, IRIS Malaysia did not convey all substantial rights in the '412 patent to Williams. Under the express terms of this agreement, IRIS Malaysia was acknowledged to be the owner of, as well as the party responsible for maintaining, the '412 patent and retained a right to develop, market, and sell the invention claimed by the '412 patent. Further, Williams' license was set to expire seven years before the '412 patent's expiration date, reverting all rights in the patent to IRIS Malaysia for that time period. So too, IRIS Malaysia had the right to terminate the agreement if Williams failed to pay royalties or achieve certain production milestones in specified timeframes. Finally, both IRIS Malaysia and Williams had the right to sue to enforce the patent on the date this suit was filed.

This leaves Defendant's alternative argument that dismissal is warranted because Plaintiff has failed to join Williams, a necessary party, or in the alternative that joinder of Williams is appropriate.[2] Two considerations persuade the Court to grant Defendant's motion for joinder. First, the absence of Williams from this lawsuit could adversely affect the interests of the three defendants in that they could face multiple lawsuits if Williams is not a party plaintiff. Second, the validity of the '412 patent is contested, and Williams as well as IRIS Malaysia has a clear interest in this issue. As such, this Court deems Williams a person needed for just adjudication of this action within the meaning of Rule 19(a) of the Rules of the United States Court of Federal Claims (RCFC) and directs that Williams be joined as a party plaintiff.

---

[2] Plaintiff contends that Williams was not a necessary party on the date the lawsuit was filed because he relinquished any right to enforce the '412 patent. However, the addendum in which Williams purported to relinquish his rights is dated November 30, the day <u>after</u> this lawsuit was filed, and Plaintiff has not demonstrated that the document is appropriately deemed to have been executed on November 29. Plaintiff had suggested that the effective date of the addendum was a day earlier than stated on the face of the document because the document was executed in Kuala Lampur, and by operation of the international date line, it was November 29 in the United States when the document was signed in Kuala Lampur on November 30. Tr. (Apr. 23, 2008) at 16-29. Plaintiff has since abandoned this argument.

2

**Background**[3]

IRIS Malaysia is the assignee of two patents -- the '412 patent issued on March 21, 2000, and U.S. Patent No. 6,111,506, entitled "Method of Making an Improved Security Identification Document Including Contactless Communication Insert Unit" (the '506 patent) issued on August 29, 2000. Compl. ¶¶ 5, 6.[4] In essence, the '506 patent allegedly entails a method for manufacturing a secure electronic passport, which contains a computer chip with biographical and/or biometric data of the passport holder, and the '412 patent allegedly embodies the technology for secure electronic passport readers, capable of reading such passport data. Id.

In March 1998, the Malaysian government introduced the first electronic passport and installed electronic passport readers at various Malaysian ports of entry. Plaintiff has been supplying these passports and readers to Malaysia. Id. ¶ 9. The United States Government has purchased several IRIS electronic passport readers from IRIS Malaysia for testing purposes and operated several of these readers at various international airports in the United States. Id. ¶ 10.

Sometime after September 11, 2001, the United States Government decided to use electronic passports and secure electronic passport readers and instituted the requirement that any citizens of foreign governments who had been eligible to enter the United States without a visitor's Visa (a program known as the U.S. Visa Waiver Program) would only be allowed to maintain that eligibility if their respective governments adopted an electronic passport. Id. ¶ 12. The governing United States statute, 8 U.S.C. § 1732, mandates that the Attorney General and the Secretary of State, inter alia: (1) "issue to aliens only machine-readable, tamper-resistant visas and other travel and entry documents that use biometric identifiers;" (2) deploy equipment and software to allow biometric comparison and authentication of machine-readable documents; and (3) require, after October 26, 2005, that any alien applying for admission to the United States under the Visa Waiver Program present a passport that incorporates biometric and document authentication identifiers. Govt. Ans. ¶ 3.

IRIS Malaysia alleges that the United States Government has installed, used and had manufactured for its use in the United States secure electronic passport readers that are infringements of one or more claims of the '412 patent, in that these readers were not purchased from IRIS Malaysia and that the United States Government had no license or right to use or manufacture them. Third-party Defendant, Fulcrum IT Services Company (Fulcrum), avers that pursuant to a contract awarded to Government Micro Resources, Inc. (GMR), by the Department of Homeland Security (DHS) on January 12, 2006, GMR sold and delivered to the DHS 503 passport readers manufactured by Rochford Thompson, and that GMR does not have a license from IRIS Malaysia to use, manufacture, procure and/or practice the inventions described in IRIS' patent. Fulcrum Ans. at 3

---

[3] This background is derived from Plaintiff's amended complaint and the attachments to the parties' motion papers.

[4] While Defendants do not dispute that Plaintiff is the assignee of the '412 patent, the patent itself as issued on March 21, 2000, lists TL Technology Research (M) SDN. BHD., Kuala Lumpar Malaysia as the assignee. Amd. Compl. Ex. A.

¶ 14. Defendants contend no license was required to manufacture or sell the readers and that the '412 patent is invalid pursuant to 35 U.S.C. § 112 (anticipation) and § 103 (obviousness). Govt. Ans. at 6 ¶ 20; Fulcrum Ans. at 3 ¶ 14; 3M Rochford Thompson Ans. and Aff. Defense at 4 ¶ 2.

**The License Agreement**

On November 6, 2001, Plaintiff executed a License Agreement purporting to make Winston Williams an exclusive licensee of technology embodied in the '506 and '412 patents. The agreement defined TECHNOLOGY as the '412 and '506 patents, as well as "trade secrets, proprietary knowledge, and practical know how in data compression, encryption and retrieval . . . ." Def.'s Mot. at A61.[5]

The original license agreement between Plaintiff and Williams contemplated two phases of performance and set various milestones, such as investments by Williams and the securing of contracts between Williams and the U.S. Government. Id. at A61-A62, ¶ 1(a). In Phase I, Williams was to invest up to $100,000 to conclude a joint venture agreement with a large publicly listed U.S. company. Id. at 61A. If this objective was not met within six months, the project was to terminate. The License Agreement provided further:

> Should LICENSOR independently contract with a third party during Phase I, LICENSOR will immediately advise Mr. Winston Williams that LICENSOR elects to terminate this LICENSE AGREEMENT and shall pay to Mr. Williams a commission of $1.00 for every chip using TECHNOLOGY sold in the United States commencing from the first sale to the third party and continuing for a period of 24 months. However, if LICENSOR contracts with the US government directly or vice versa, no commission will be payable.

Id. Phase I was accomplished, and Phase II began as of February 1, 2003. Id. at A56.

In Phase II, the joint venture was required "to use its best efforts and commit up to $400,000 to promote the TECHNOLOGY and secure an initial procurement contract with the US government . . . ." Id. at A62. At the commencement of Phase II, an exclusive license was to vest in Williams "or his assigns." The License Agreement further specified:

> At the end of Phase II, if an agreement has been concluded with the US government, and contingent upon continued payment of agreed fees and minimum royalties to LICENSOR, the exclusive license rights shall extend for the duration of the Government contract or the life of the patents, which ever ends first. If no agreement with the US government has been obtained at the end of . . . Phase II, all rights shall immediately revert back to LICENSOR."

---

[5] The term TECHNOLOGY also included "the subject matter of any continuation patent application or continuation-in-part patent application or divisional patent application or reissue patents." Id. at A61.

4

Id. at A62. Upon request by Williams, IRIS Malaysia was obligated to grant Williams a one-time 90-day extension. Id.

The License Agreement recited the following obligations:

> LICENSOR shall pay to Mr. Winston Williams for any business (resulting in IRIS making sales) which shall have been created or instigated by the efforts of Winston Williams and his associates during the operation of this agreement, but which comes to fruition at a later date and after the expiration of this agreement, a commission of US $1.00 per chip and 10% of the sales of any other hardware or software for as long as the customer who was initially motivated by Winston Williams shall continue to make purchases from IRIS.

Id. at A69.

The agreement provided that the grant of license was exclusive in the United States, and that the exclusivity of the license would lapse, and become non-exclusive, upon the earliest occurrence of either: "(i) the second annual anniversary of the date of the commencement of exclusivity if by such date LICENSEE shall not then have paid Royalty payments attributable to at least 200,000 chips, or (ii) upon the expiration of any twelve (12) month period following the second annual anniversary of the commencement of exclusivity if, during such twelve (12) month period, LICENSEE shall not then have paid Royalty payments attributable to at least 200,000 chips." Id. at A69.

The License Agreement specified that IRIS Malaysia retained ownership in the TECHNOLOGY as follows:

> Ownership of TECHNOLOGY. LICENSEE acknowledges that ownership of TECHNOLOGY is in LICENSOR. LICENSOR shall be responsible for the maintenance of TECHNOLOGY . . . . LICENSEE agrees that it will do nothing inconsistent with LICENSOR's ownership of TECHNOLOGY and that all use of TECHNOLOGY will inure to the benefit of LICENSOR. LICENSEE agrees that nothing in this Agreement shall give LICENSEE any right, title, or interest in TECHNOLOGY, other than the right to use TECHNOLOGY as specified herein.
>
> LICENSOR shall own all copyright, trademark, trade secrets and patent rights relating to TECHNOLOGY developed and obtained as a result of any business relationship between LICENSOR and LICENSEE.

Id. at A63 ¶ 2. The License Agreement further provided:

> LICENSOR will grant to LICENSEE at the commencement of Phase II an exclusive license to use TECHNOLOGY, the know-how related thereto, and any modifications and improvements in the technology relating to TECHNOLOGY, owned directly or indirectly by LICENSOR, solely for the manufacture, production, and assembly of systems for security encryption, compression, storage, retreival [sic] and decryption

employing TECHNOLOGY, and associated software, including but not limited to passports, alien registration cards, credit cards and drivers licenses.

Id. at A69.  The license agreement also provided that Williams could either purchase certain items from IRIS Malaysia at a predetermined purchase price or obtain them from an alternate source, paying IRIS Malaysia a technology transfer fee and royalties on any sales made to the United States Government.  Id. at A62 ¶ 1(b), A66 ¶ 10.[6]

Under the License Agreement's Termination Clause, IRIS Malaysia could terminate the agreement in the event of:

> (i) any total or partial failure by LICENSEE to timely pay amounts due . . . ; (ii) following the second annual anniversary of the date of this agreement, any total or partial failure by LICENSEE to cause production of at least 200,000 chips, and pay Royalties attributable thereto . . .  in any twelve (12) month period following the second annual anniversary; or (iii) the bankruptcy, receivership, or insolvency of the LICENSEE.

---

[6] Paragraph 1(b) Royalty-Payments, provided that Williams:

[S]hall at his sole discretion either purchase from LICENSOR at the following price, or shall manufacture himself or obtain from an alternate supplier or sublicense and pay LICENSOR a Royalty calculated as follows:

Purchase Price

| | |
|---|---|
| Each passport with the 8 Kbyte chip: | USD 15.00 |
| Each 8 K byte chip alone | USD 10.00 |
| Each capture & personalization system | USD 16,000.00 (hardware) |
| Each retrieval system | USD 5,000.00 (hardware) |
| One time license fee per system installed | USD 4,500 (per capture system) |
| System software charge | USD 1,650,000 (per country) |
| One-time customisation charge | USD 250,000. |

Payments for Technology Transfer if chip is manufactured in the US by joint venture partner:

One-time technology transfer fee          USD 4,000,000

Plus royalty of 8% of the price paid by the US government per chip.

Def.'s Mot. at A62.

6

Id. at A66.

Paragraph 10 provided that: "This Agreement and the Grant of License hereunder may be assigned or transferred by LICENSEE in whole or in part, directly or indirectly." Id.

The original License Agreement also contained the following provisions regarding the right to sue for infringement of, inter alia, the '412 patent:

7. Infringement by Others.

7.1 LICENSOR may, in its own name, bring or prosecute infringement suits against others who are infringing the patents within LICENSOR Patent Rights or Trademark and shall be entitled to all recovery therefrom. LICENSOR shall have the full and sole right to control such suit or other proposed litigation and may discontinue any such suit or proposed litigation at any time upon giving thirty (30) days written notice of its intent to do so to LICENSEE. LICENSEE may, at its sole option, thereafter elect to continue such suit or other litigation at its own expense as evidenced by written notice to LICENSOR, and in such event, LICENSEE shall be entitled to all recovery therefrom, but shall keep LICENSOR fully advised of the progress of such continued suit or other litigation. Notwithstanding the foregoing, LICENSOR may, but is not required to, provide written notice to LICENSEE its intent to file suit and, within a period of 30 days, LICENSEE may elect to join in such suit and share equally in all expenses and recoveries.

7.2 LICENSEE may, in writing, call to the attention of LICENSOR any infringement of LICENSOR Patent Rights or Trademark, and if, within two (2) months after the receipt of such notice, LICENSOR shall have failed to institute suit with respect to such infringement, LICENSEE shall have the right and option to bring suit, and if necessary, LICENSOR will join as a party thereto and execute any required papers, but LICENSEE shall pay the entire expenses thereof and may retain all recovery secured therein; provided, however, in the event that LICENSOR is engaged at the end of said two (2) months in negotiations for the settlement of the said patent infringement which has been the subject of notice from LICENSEE to LICENSOR and has advised LICENSEE in writing of such negotiations, then the above mentioned right and option of LICENSEE to bring suit shall be exercised only with the written consent of LICENSOR which will not be unreasonably withheld. LICENSEE shall be kept fully informed in writing by LICENSOR of the progress of such negotiations for the settlement of the alleged infringement.

Id. at A65.

**The Undated Addendum**

Subsequently, at some time between November 6 and November 30, 2001, IRIS Malaysia and Williams executed an undated Addendum to the License Agreement which stated in toto:

7

>Notwithstanding any other provisions of this Agreement, the following new provisions shall apply:
>
>1. Licensee shall have the right to:
>
>   a) Contact and send "cease and desist" notices to infringers and potential infringers.
>
>   b) Negotiate settlement terms of claims for infringement and negotiate license agreements.
>
>   c) Bring and direct lawsuits at any time to enforce patent rights and trademarks.
>
>2. Licensor shall join Licensee as a party and execute any documents required to maintain or advance a lawsuit under this Addendum.
>
>3. For any actions initiated by Licensee under this Addendum, Licensee and Licensor agree to share equally expenses and returns relating to the enforcement and settlement of patent rights.
>
>4. Licensor agrees that while Licensee is negotiating issues of intellectual property rights or preparing or maintaining an infringement suit (including appeals, enforcement, and collection of revenues) the License vested in Licensee under Phase 2 of this Agreement shall remain in effect.

Id. at A74.

**The June 20, 2002 Amendment**

Plaintiff and Williams later executed an amendment dated June 20, 2002 (June 20 Amendment), which states:

>This license granted in this contract shall only cover products which use IRIS core technology and use the IRIS operating system. Licensor may sell the use of its manufacturing facilities to US customers for such purposes as producing phone cards and other products which do not use the core technology. Licensee shall retain exclusive US rights for all passport, security card, other security and identity systems, and related products that utilises the core operating system. The license shall include any related new technology developed on the IRIS core operating system by Licensor during the period of this agreement.

Id. at A54 ¶ 2, A57 ¶ 1. Amendments to the License Agreement extended the duration of Phase II initially until December 31, 2006, and then until "at least May 5, 2010," or through the length of any United States Government contracts. Id. at A72 ¶ 2, A73 ¶ 3, A60 ¶ 6.

**The November 30, 2006 Addendum**

In another Addendum dated November 30, 2006, the day after the instant lawsuit was filed, Plaintiff and Williams agreed:

> Notwithstanding any other provisions of this Agreement, the following new provisions shall apply:
>
> 1. Licensor wishes to commence litigation to enforce Licensor's US Patent Nos. 6,041,412, and 6,111,506, in the Courts of the United States ("Litigation").
>
> 2. In the event Licensor recovers monies or other items of value by judgment or by settlement (collectively "Proceeds") in any Litigation suit, Licensor shall pay to Licensee upon collection, 30% of the Proceeds of such suit remaining after deduction from the entire Proceeds of that suit reasonable Litigation expenses and legal fees for that suit. Licensee shall also receive 30% of all royalties from any license obtained in any settlement or judgment in any Litigation suit.
>
> 3. Pending disbursement of proceeds, all funds due to Licensee shall be held in escrow in the United States. Disbursement of proceeds to Licensee and Licensor shall occur at the same time.
>
> 4. With regard to the currently contemplated Litigation, in consideration of Licensor's agreement to share the proceeds of any successful litigation to enforce the above patents, Licensee hereby relinquishes all rights to either enforce rights related to such litigation under the aforesaid patents and/or participate in any such litigation Licensor may undertake to enforce said US patents. Licensee shall not intervene in such proceedings unless requested to do so by Licensor or joined by a court of competent jurisdiction. Licensee may advise Licensor in writing of any new infringement under any of the above patents and if, within 3 months of such notice, Licensor fails to commence legal proceedings, Licensee shall have the right to bring suit and Licensor will assist Licensee in such suit in whatever manner necessary and appropriate but shall not be required to share the costs of such suit.
>
> 5. Licensor shall keep Licensee or its counsel fully informed at all times in writing of the progress of the aforementioned US litigations.
>
> . . .

Id. at A60.

**American IRIS, Inc.**

The website of American IRIS, Inc., filed by Defendant, states that American IRIS is "the exclusive US licensee of the world's most advanced smart passport technology" and lists the '412 patent as its intellectual property. Id. at A40. In response to a discovery request for "documents

9

memorializing licensing arrangements between American IRIS and [IRIS Malaysia]," id. at A37, counsel for IRIS Malaysia -- who does not represent American IRIS in this litigation -- stated:

> I emailed Iris [Malaysia] for a copy of whatever documents they may have that would be responsive to your request, assuming they have something that has not already been produced. I expect to hear back from them this week. In the interim I was told that American IRIS (which is neither owned nor controlled by plaintiff) had an agreement to help IRIS bid for, I believe, the US epassport project. Not sure if they were involved in an [sic] bids for the reader. In any event I was also told that American Iris spent their own funds in that regard, and that American Iris has a contingent interest on any net recovery on the IRIS US patent litigations. American IRIS has no other interest in any of plaintiff's intellectual property. Take this as an informal response, to be followed by documents shortly, as I mentioned above.

Id. at A36.[7]

By letter dated April 3, 2007, counsel for American IRIS, Christopher J. Kay, advised Williams that "your license rights were not extinguished by the [November 30] addendum" and "[y]ou currently possess the exclusive right to import, manufacture, use, sell, and offer for sale, IRIS TECHNOLOGY in the United States." Id. at A83. By e-mail dated July 17, 2007, Williams advised a Mr. Semple, "I am the exclusive licensee for IRIS technology (including the patents) in the US and certain other countries." Id. at A84.[8]

## Discussion

Standing to sue is a threshold jurisdictional requirement in every federal action, and standing must be present at the time the suit is brought. Sicom Sys., Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 975-76 (Fed. Cir. 2005). "Because standing is jurisdictional, lack of standing precludes a ruling on the merits." Media Techs. Licensing, LLC v. Upper Deck Co., 334 F.3d 1366, 1370 (Fed. Cir. 2003). In considering a motion for dismissal under RCFC 12(b)(1) for lack of subject matter jurisdiction, the court normally considers the facts alleged in the complaint to be true and correct, but may consider relevant evidence in order to resolve any factual dispute. See Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988). Plaintiff has the burden to prove that the court has jurisdiction.

**Because Williams Did Not Hold All Substantial Rights in the '412 Patent When This Lawsuit Was Filed, Plaintiff Has Standing to Sue**

Subject matter jurisdiction for claims of governmental patent infringement is conferred on this Court by 28 U.S.C. § 1498(a). Standing to sue the Government for patent infringement derives

---

[7] Neither party has submitted the referenced documents to the Court.

[8] This e-mail was produced pursuant to a subpoena served by Defendant on American IRIS. See Def.'s Mot. A34, A40 and A47.

from the same statute which gives the "owner" of a patent the right to bring suit against the Government for compensation for the Government's use and manufacture of the owner's invention. 28 U.S.C. § 1498(a). The Supreme Court has interpreted the word "owner" to mean that a plaintiff proceeding under section 1498(a) must have at least such an interest as would support a lawsuit against a private defendant. E.W. Bliss Co. v. United States, 253 U.S. 187, 191-92 (1920). Suits against private defendants are governed by 35 U.S.C. § 281 which states that "[a] patentee shall have remedy by civil action for infringement of his patent."

A patentee may transfer title to a patent by assignment, and the assignee may be deemed the effective patentee and sue for patent infringement in its own name. Aspex Eyewear, Inc. v. Miracle Optics, Inc., 434 F.3d 1336, 1340 (Fed. Cir. 2006) (citing Prima Tek II, L.L.C. v. A-Roo Co., 222 F.3d 1372, 1377 (Fed. Cir. 2000). However "[e]ven if the patentee does not transfer formal legal title, the patentee may effect a transfer of ownership for standing purposes if it conveys all substantial rights in the patent to the transferee. In that event, the transferee is treated as the patentee and has standing to sue in its own name." Propat Int'l Corp. v. RPost, Inc., 473 F.3d 1187, 1189 (Fed. Cir. 2007). "Only the entity or entities that own or control all substantial rights in a patent can enforce rights controlled by that patent, lest an accused infringer be subjected to multiple suits and duplicate liability." IpVenture, Inc. v. ProStar Computer, Inc., 503 F.3d 1324, 1325 (Fed. Cir. 2007). Even if an entity has been granted an "exclusive licensee," that moniker does not itself mean that "all substantial rights" were conveyed in the instrument. See Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1344 (Fed. Cir. 2001) (stating that the title of the agreement at issue, whether it is termed a "license" or an "assignment," is not determinative of the nature of rights transferred under an agreement). Rather, in considering whether a transferee has received "all substantial rights" from a patentee in a licensing agreement, the court must ascertain the intention of the parties and examine the substance of what was granted by the agreement. See Mentor H/S, Inc. v. Med. Device Alliance, Inc., 240 F.3d 1016, 1017 (Fed. Cir. 2001); Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 874 (Fed. Cir. 1991).

Defendant contends that Plaintiff lacks standing because, at the time this suit was filed, IRIS Malaysia had conveyed all substantial rights in the '412 patent to Williams.[9] The License Agreement of November 6, 2001, and its addenda, exclusively govern what rights were transferred from Plaintiff to Williams. Because standing must be established as of the date this action was filed, the Court only considers addenda in effect on the date the complaint was filed, i.e., November 29, 2006, and not those executed thereafter. Aspex Eyewear, 434 F.3d at 1341.

In assessing whether all substantial rights were transferred to a licensee, it is instructive to examine what rights the patentee retained as well as those it transferred. Intellectual Prop. Dev., Inc., 248 F.3d at 1342 (Fed. Cir. 2001). As the Federal Circuit recognized in Aspex Eyewear, 434 F.3d at 1341, "[t]he essential issue regarding the right to sue on a patent is who owns the patent."

---

[9] Specifically, Defendant identifies the following "rights" it claims Williams possessed:
    1)  the right to enforce the '412 patent without input from Plaintiff,
    2)  the unfettered right to make, use and sell the '412 patent,
    3)  the exclusive right to grant a license to the Government on the date suit was filed.
Def.'s Mot. at 12-18.

Importantly here, IRIS Malaysia expressly retained ownership of the TECHNOLOGY. The License Agreement was clear, stating in a paragraph entitled <u>Ownership of TECHNOLOGY</u>: "LICENSEE acknowledges that ownership of the TECHNOLOGY is in LICENSOR . . . LICENSOR shall own all copyright, trademark, trade secrets and patent rights relating to TECHNOLOGY developed and obtained as a result of any business relationship between LICENSOR and LICENSEE." Def.'s Mot. at A63.

In addition to its outright asserted retention of ownership, IRIS Malaysia did not convey to Williams an exclusive license for the full term of the patent. Rather, Williams' license was set to terminate on May 5, 2010, more than seven years prior to the '412 patent's expiration on November 13, 2017. <u>Id.</u> at A59.[10] In <u>Aspex Eyewear</u>, the Federal Circuit found such a limited license term a significant indicium that the patent owner had not transferred all substantial rights. In <u>Aspex Eyewear</u>, the patent owner transferred to a third party "(1) the exclusive right to make, use, and sell products covered by the patent; (2) the right to sue for infringement of the patent; and (3) a virtually unrestricted authority to sublicense its rights under the agreement." 434 F.3d at 1342. The Court nonetheless held that the licensee received fewer than "all substantial rights," focusing on the duration of the licensed rights:

> [The transferee's] rights, however substantial in other respects, are unquestionably valid for only a limited period of time . . . . As of March 16, 2006, [the patent owner], absent an amendment of the agreement, will regain all of the rights under the [patent-in-suit] that it had previously transferred to [the transferee]. It is thus the unquestioned owner of the patent, and, whatever rights (the transferee) had up until 2006, it is clear that [the transferee] never had all substantial rights to the patent, i.e., it never was the effective owner of the patent. . . . *By having rights for only a limited portion of the patent term, it simply did not own the patent. It was merely an exclusive licensee without all substantial rights.*

<u>Id.</u> at 1342-43 (emphasis added).

Defendant attempts to distinguish <u>Aspex Eyewear</u>, arguing that Williams' exclusive license could be extended throughout the remaining life of the '412 patent if Williams were to secure a contract with the United States Government. There are several impediments to Defendant's argument. First, Williams has not procured any contract with the United States Government with respect to the technology at issue, and any potential award of a government contract is speculative. Second, even if Williams had procured a Government contract, that would not extend his license for the duration of the <u>patent</u>. Rather, the term of any license procured by Williams was to be measured by the <u>duration of the procured contract</u>, rather than by the expiration date of the '412 patent. Def.'s Mot. at A66.

---

[10] The '412 patent issued from an application filed on November 14, 1997, (Compl., Ex. A ('412 patent), at cover page) and expires twenty years from that date. <u>See</u> 35 U.S.C. § 154(a)(2).

12

The Federal Circuit has recognized that provisions governing the right to sue third parties for infringement can be important in determining whether all substantial rights have been transferred.  See, e.g., Mentor H/S, Inc. v. Medical Device Alliance, Inc., 240 F.3d 1016, 1018 (Fed. Cir. 2001) (per curiam) ("In Vaupel Textilmaschinen DG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 875 (Fed. Cir. 1991) the grant of the right to sue for infringement, subject only to the obligation to inform the patentee, was particularly dispositive of our conclusion that Vaupel was an exclusive licensee with all substantial rights in the patent and could bring suit in its own name"); but see Propat Int'l Corp., 473 F.3d at 1192 ("While the rights to sue and grant licenses accord Propat broad authority to act as Authentix's agent for purposes of licensing and litigation, they do not transfer ownership of Authentix's patent.").  Here, the License Agreement's right-to-sue provisions underwent several iterations.  Originally, only IRIS Malaysia had the right to sue with the full and sole right to control such suit -- Williams could only sue if IRIS Malaysia opted not to.  Further, IRIS Malaysia had the right to reap "all recovery therefrom."  Def.'s Mot. at A64 ¶ 7.1.

In the undated addendum, Plaintiff purported to give Williams three rights: 1) to send cease and desist notices to infringes; 2) to negotiate settlements of infringement claims; and 3) to bring and direct lawsuits at any time to enforce patent rights.  Id. at A74.  However, the language of the addendum suggests that the conferral of these rights was in addition to, not in derogation of, the right to sue previously conferred upon IRIS Malaysia, in that the addendum did not divest IRIS Malaysia of such rights granted under the original agreement.  The undated addendum expressly stated "Notwithstanding any other provisions of this agreement the following new provisions shall apply," and proceeded to list the three rights conferred on Williams.  Id.  The Federal Circuit has recognized that "notwithstanding" means "in spite of," Crnkovich v. United States, 202 F.3d 1325, 1334 (Fed. Cir. 2000) (citing Webster's Third New Int'l Dictionary (1976) at 1545), and stating that a phrase beginning with "notwithstanding" did not create an exception to the broad authorization in the preceding phrase).  This definition contemplates that the "new" provisions would not supplant that original agreement altogether, but rather apply together with and "in spite of" the original agreement's provisions.  Since the "new" provisions neither gave Williams the exclusive right to sue, nor divested IRIS Malaysia of such rights granted under the original agreement, they should not be read as wholly displacing IRIS Malaysia's rights.  Read with the original agreement, the addendum gives both IRIS Malaysia and Williams the right to sue for infringement.[11]  Indeed, under the addendum in any action initiated by Williams, both he and IRIS Malaysia were to be plaintiffs and share in the expenses and recovery.  Thus, the addendum which empowered Williams to sue diluted IRIS Malaysia's right to sue but did not eliminate it.[12]

Other provisions in the License Agreement confirm that IRIS Malaysia did not convey all substantial rights in the '412 patent to Williams, as it had express responsibility for maintenance

---

[11] Further, the language prescribing terms "for any actions initiated by Licensee under this Addendum . . ." suggests that there could also be actions initiated by Licensor.  Id. at A74, ¶ 3.

[12] The Court recognizes that in an addendum dated the day after this action was filed Williams transferred all his rights to sue back to IRIS Malaysia.  However, the Court does not consider this in assessing standing as Plaintiff has failed to establish that this addendum was in effect at the time this action was filed.

of TECHNOLOGY, and an express agreement that all use of TECHNOLOGY was to inure to its benefit.  See Propat Int'l Corp., 473 F.3d at 1189 ("The responsibility to maintain a patent is one of the obligations that has been recognized by this court as an indication that the party with that obligation has retained an ownership interest in the patent." (citing Mentor H/S, Inc., 240 F.3d at 1018 )).  Additionally, the Agreement contemplated that IRIS Malaysia retained the right to sell the TECHNOLOGY to third parties during Phase I of the contract period.  The Agreement specifically provided that if IRIS Malaysia independently contracted with a third party during Phase I, IRIS Malaysia would terminate the agreement with Williams and pay him a $1 commission for every chip using TECHNOLOGY sold in the United States for 24 months, except that IRIS Malaysia would not pay Williams any commission if IRIS Malaysia itself contracted with the United States Government.  Further, although IRIS Malaysia purported to grant Williams an exclusive license in Phase II to use TECHNOLOGY for the manufacture of certain systems, the License Agreement contemplated that IRIS Malaysia itself could also supply chips, passports, and systems which used the TECHNOLOGY to Williams for sale to the United States Government.

Further, the Agreement does not clearly explicate in whose name sales by Williams to the Government would be made, but does suggest that such sales would be in IRIS Malaysia's name. The Paragraph entitled "Obligations of Licensee to Licensor" provides: "LICENSOR shall pay to . . . Williams for any business (resulting in IRIS making sales) which shall have been created or instigated by . . . Williams . . . during the operation of this agreement, but which comes to fruition at a later date . . . a commission for as long as the customer who was initially motivated by . . . Williams shall continue to make purchases from IRIS."  Def.'s Mot. at A69 (emphasis added).

Finally, IRIS Malaysia retained the right to make the licensee nonexclusive or terminate the License Agreement if Williams failed to timely pay royalties or failed to cause production of at least 200,000 chips and pay royalties thereon within a two or three-year timeframe, further suggesting that IRIS Malaysia did not convey all substantial rights.

Although Williams did have the right to assign or transfer the license so long as royalties were paid, this does not outweigh the other substantial rights retained by IRIS Malaysia. In sum, because the License Agreement and addenda in effect on the date this suit was filed did not transfer all substantial rights in the '412 patent to Williams, IRIS Malaysia has standing.

**Joinder of Winston Williams Is Needed For Just Adjudication**

In the alternative, Defendant has moved to dismiss this action under RCFC 12(b)(7) for failure to join Winston Williams.  In determining whether to dismiss a lawsuit for failure to join a necessary party, this court analyzes the factors enunciated in RCFC 19.  See J.G.B. Ents., Inc. v. United States, 57 Fed. Cl. 415, 416 (2003).  Rule 19 sets out two separate tests, one to determine whether a party is "necessary," and another to determine whether the case should be dismissed under RCFC 19(b) "[i]f an absent party is 'necessary' but cannot be joined . . . ."  United Keetoowah Band of Cherokee Indians v. United States, 480 F.3d 1318, 1324 (Fed. Cir. 2007).  In considering a motion to dismiss under RCFC 12(b)(7), the Court may consider relevant extra-pleading evidence.  See Citizen Band Potawatomi Indian Tribe of Okla. v. Collier, 17 F.3d 1292, 1293 (10th Cir. 1994).

Rule 19 provides in pertinent part:

**Joinder of Persons Needed for Just Adjudication**

**(a) Persons to be Joined if Feasible**. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made an involuntary plaintiff.

Here, Williams retains a significant interest in the patent-in-suit. Even under the November 30 addendum, Williams has a long-term exclusive license with a potentially substantial financial stake in the patent-in-suit. The validity of that patent is squarely at issue in this lawsuit. Moreover, Williams would receive 30 percent of the proceeds of this litigation. As such, the disposition of IRIS Malaysia's suit without Williams could impair or impede Williams' ability to protect his interests.

In addition, the disposition of this suit could expose the defendants to multiple lawsuits if Williams is not joined here.[13] See Abbott Laboratories, 47 F.3d at 1133 (recognizing that "the purpose of Rule 19 -- to avoid multiple suits or incomplete relief arising from the same subject matter" is served by joinder of patentee in suit by exclusive licensee). It is well settled that "[f]or the same policy reasons that a patentee must be joined in any lawsuit involving his or her patent, there must be joinder of any exclusive licensee." Aspex Eyewear, 434 F.3d at 1344,(citing Independent Wireless Tel. Co. v. Radio Corp., 269 U.S. 459, 466 (1926)). See also, Prima Tek II, L.L.C., 222 F.3d at 1381 ("one of the underlying policies of the rule of Independent Wireless is to prevent duplicative litigation against a single accused infringer") (citations omitted); see generally, 2 Jay Dratler, Licensing of Intellectual Property, § 8.06 [1], at 8-62.21 (2007) (explaining that a rationale for this rule is the recognition that "in almost every patent infringement action, the accused infringer challenges the validity of the patent and a court's determination of validity is binding in future actions") (citing Aspex Eyewear, 434 F.3d at 1343).

Counsel for IRIS Malaysia has represented to the Court that Mr. Williams resides in Florida and that his counsel will accept service. Tr. (Apr. 23, 2008) at 8. As such, the Court determines that joinder of Mr. Williams is feasible within the meaning of Rule 19(b).

---

[13] These same concerns may apply to American IRIS which also claims to be an exclusive licensee and to have an interest in the '412 patent, insofar as it lists this patent as its intellectual property on its website.

**Conclusion**

1. Defendant's Motion to Dismiss for lack of standing is **DENIED**.

2. Defendant's Motion to Join Winston Williams as a Party Plaintiff under RCFC 19(a) is **GRANTED**.

3. Subject to the provisions of the Protective Order issued herein, Winston Williams shall be notified of this litigation and appear and present any claim he may have in the subject matter of the litigation, in the absence of which he will be bound by any judgment entered herein. Plaintiff shall coordinate with Williams, and they shall file an amended complaint listing Williams as a party plaintiff and adding any pertinent allegations. However, because this decision is filed under seal, counsel for Winston Williams must be admitted under the Protective Order in this action **PRIOR TO** being served with this opinion and other protected material in this action, and complying with this Order.

4. The Court will convene a telephonic status call on **July 2, 2008 at 11:00 a.m. E.T.** to discuss the most expeditious means of effecting the joinder of Mr. Williams in light of the Protective Order. The Parties shall also be prepared to discuss whether American IRIS should be joined in this action, and to clarify the status of discovery regarding this entity.

5. The parties shall file proposed redactions to this opinion by **July 3, 2008.**

        s/Mary Ellen Coster Williams
        **MARY ELLEN COSTER WILLIAMS**
        **Judge**